resistance. Please be seated. Thank you, Your Honor. May it please the Court, my name is Bill Lee and together with my partners Warren Fletcher and Andrew Danforth, I represent Apple. From the briefing, the Court knows that we suggest that there are numerous errors below that resulted in a verdict not supported by the law or the evidence. Given the limits of time, I'd like to focus on three issues today, but would be happy to address any issues the Court would like me to address. The three issues are these. First, the District Court's mainly erroneous construction of the claim term prediction and its error in granting summary judgment on a disputed factual record. Second, the undisputed fact that the accused Apple products use hashed load tags corresponding to a group of load instructions and therefore do not make a prediction based upon a particular load instruction. And third, the District Court's legally erroneous instruction on the issue of vicarious liability and the lack of any evidence that the pizza-sized wafers leaving the Samsung facility in Texas were capable of executing program instructions. Those are the three. Let me turn to the first. With respect to the second one, if we were to conclude that that there was waiver with respect to the request for an instruction on the term particular, where does that leave you? Your Honor, actually there are two independent bases to address the fact that this undisputed fact that we use the hash load tags that are associated with a group of load tags should result in judgment for Apple, and there are two separate issues. One is not dependent upon the claim construction issue at all. It's not disputed. All of the experts agree that we hash the load tags, and as a consequence, every load tag is associated with a group of instructions. On the plain meaning of particular, that is not associated with a particular instruction, and all the court needs to do is consider the undisputed fact that we hash the load tags, the undisputed resulting fact that every load tag is associated with a group of instructions. As a consequence, your Honor knows, we can only have 4,026 load tags entirely. It's 2 to the 12th. There are millions and millions of load instructions. As a consequence, it's not dependent upon the claim construction dispute, although that's an independent reason that there should be a new trial. Why is it not dependent on the claim construction? Isn't it dependent on both sides agreeing that it's plain and ordinary meaning? So if we're going to assess the jury verdict against the claim construction, what do we do with that? I mean, we have to define plain and ordinary, what plain and ordinary meaning is. Your Honor, actually, that's correct, and I've tried to distinguish the two sets of circumstances, determining what the plain and ordinary meaning is and going to Judge O'Malley's question about what happened when the court decided to took the position that the plain and ordinary meaning of the word particular was a single load instruction. That is, we took the position throughout the case that the focus should be on... By which you mean one and only. One and only. The problem is, a number of these formulations that get thrown around are not necessarily inconsistent with a load instruction, but possibly others as well. And the question is, which side of that line does particular fall on? And, Your Honor, let me break it into two distinct arguments, if I could. Let's take the plain and ordinary meaning argument to go to Chief Judge Crowe's question. We took the position, just as you say, that the plain and ordinary meaning is a single load instruction, consistently. And we said the question is, for the hash load tags, are they associated with a single load instruction? And the answer is no. The only evidence you have about what the plain and ordinary meaning of particular is, is that A144 to A145. There, the district court quotes two dictionary definitions that are the plain and ordinary meaning. They both describe it as a single instruction. He then goes on to say... ...of LeBron James scoring so many points, because it could also be associated with the particular event of the other team not scoring as many points, or with someone else on the team scoring a particular number of points. In other words, just because you're talking about particular meaning one thing, doesn't mean it can't be associated with more than one thing. Actually, Your Honor, if you read the claim, and the plain and ordinary meaning of the claim, it does. It would be harder next year to predict whether the Cleveland Catholic Capillaries are going to win without LeBron James or not. That's a more difficult prediction. It's probably pretty easy to predict now. Game by game. To go to Judge Bryson's question and to use your example, if you look at the claim, and this is plain meaning now. This is setting aside the claim construction dispute, the waiver issue that led us into this portion of the argument. The claim itself refers to the particular load instruction. The particular load instruction has an antecedent basis. The antecedent basis in the claim is a load instruction. Then after identifying a load instruction, you come down in the claim and it refers to that particular load instruction. As the district court said, the word particular has to have a meaning. If you eliminated the word particular and just said associated with the load instruction, it would have exactly the meaning that you've identified, exactly the meaning that you've identified. There would be no additional meaning at all. Why isn't it possible? You've mentioned, and I think it's appropriate, the antecedent reference to the load instruction. Why isn't it a perfectly plausible reading of the language of the limitation A to say that they're using the word particular in effect as an equivalent of the word said? If the word said were there, I don't think your argument would hold water, would it? Because it could be said instruction or it could be other instructions. It wouldn't be exclusionary. Your Honor, I'd say two things. One, it's not said. Well, I understand that. But the question is, can it be understood to be the equivalent of said? In other words, when you say the particular instruction, the particular instruction to which we have referred above. And, Your Honor, the answer is no for three reasons. The first is the word particular, rather than the word said, is used 20 times in the specification. And if I took, Your Honor, to the bottom of Column 10 and the top of Column 11, and you trace through what's happening in Figures 2, 3, and 4, you will see it is the particular, the one instruction. So that's point number one. Point number two, the word particular is used consistently in these 20 different references to point to one and only one instruction. All throughout the course of the trial, you talked about a single instruction. And even when you at the last minute said you wanted, you said, you've probably already ruled on this, but we're going to ask you to give this instruction. And you said you wanted to say it was a single, you wanted to use it as a single load instruction. But single is very different from one and only one, which is now what you're arguing on appeal. Actually, Your Honor, what we're arguing is a single instruction. And if I could answer that and address the waiver issue, Your Honor, originally, the original answer to the question, and then actually address a couple of the other issues that I have during the course of our time. Here's the reason, respectfully, there was a different set of circumstances than I think Your Honor just described. But my third point, going to Judge Bryson, is actually built upon what you just said. The judge determined what the plain and ordinary meaning was. He said it was the single instruction. Well, but then on JMOL, he came back and gave a very, to my eyes at least, different interpretation of what the plain and ordinary meaning was, which is unhelpful to you. And Your Honor, there is a bizarre and unusual set of circumstances that led to that portion of the JMOL opinion. But to go to Judge O'Malley's question, which is where it began, is we didn't ask for the construction. And that's the place where I was respectfully disagreeing. No. In writing, right here. No, no. What happened is this, Your Honor. On the third day of trial, WRF moved. This is WRF's motion to exclude your testimony. And then we said in response, we have said from the outset this is plain meaning. It is still plain meaning. There's no construction required. But if there's a construction required, it is the single instruction. But you never asked for it. And then at the end of the charge conference, you submitted one document that said you've probably already ruled on this. We know we didn't ask for a construction. And now we want it to be a single. Not one and only, but a single. No, Your Honor. Actually, what happened is when we responded to WRF's motion, we said we don't think construction is required. But if it is, it is a single instruction. And if you decide to instruct, if you decide to construe, you should instruct the jury. On October the 8th, which was the third day of trial, the judge issued his opinion and construed. We then said the very next morning, having adopted a construction, even though we suggested you didn't need to, the jury should be charged. This was still two days of trial left. It was before the charging conference. It was within 24 hours of his ruling. And that's why I said I was disagreeing with the facts, because it's a different set of circumstances. Can I just ask you a little about that? I mean, you've mentioned that this was a really set of unusual circumstances, and I can't disagree with you. But what was going on here? I mean, even originally before this motion and your cross-examination of Dr. Conte, I guess, there seemed to be a pushback or a tension. And the court's aversion to your getting in too much detail as to what plain and ordinary meaning is. And indeed, even in his, when he decided, granted your, or denied the motion, and he gave you the construction that you now say you wanted, which is single, his last sentence is, but don't emphasize the importance of that. So I'm just asking you for a little help here in terms of, there was a constant pushback. Your Honor, I wish I could give you an explanation. I don't have one, even though I was there. But what happened was this. We, going to Judge O'Malley's question, we have litigated this as a factual issue from the outset. Plain and ordinary meaning, we don't have a particular instruction we hash. And the facts, as I said at the outset, are undisputed. That had been our expert view from the outset. Then, on a second day of trial. But contrary to the Morse expert's position. Who said before trial that the word particular had no meaning. It added nothing to the claim. Well, but that's, well, okay. And then we get to the portion of the trial that Judge Prost is referring to. And the issue of where is claim construction coming in under the guise of an expert's deposition becomes an issue. And there's a series of objections that I made. There is some that were sustained. Some that were overruled. Then, Worf makes the motion. And the judge finds that there's a fundamental claim construction issue. He finds that he should construe it. He does construe it to say a single instruction. And then he says, but I'm not going to tell the jury. And, by the way, you can't focus on it. With your expert who's going to testify the next day. He didn't really say he was construing it. He didn't really say I'm not telling the jury. What he said is, you all both said plain and ordinary meaning. And he said that your expert's testimony was consistent with the concept of plain and ordinary meaning. So I won't exclude it. And that's not exactly the same thing as saying there's a claim construction dispute. I'm going to construe it. I'm not going to tell the jury. I mean, you're trying to set up this O2 micro thing, and that's not exactly how it happens. Your Honor. He was really in your favor by saying go ahead. Make this argument. But I don't think it's quite just go ahead. When someone says there's a fundamental claim construction dispute, I'm going to construe it. Whichever construction you decide. And if you read his opinion, he addresses their argument that the comprising language somehow expands the scope of the claim. And then you come back and say, having construed it, I'm not going to instruct the jury. And you should not emphasize it. But I think there are two distinct issues here. One is there is a plain and ordinary meaning. It may be that you have. Well, let me ask you that. Let me ask you hypothetically if none of this had happened during trial. The parties had stuck to plain and ordinary meaning. They hadn't filed their motion to exclude your witness testimony. And it had just gone on, and there was no discussion of giving it an additional construction. Where would we be? We have a jury verdict. You and Mr. Chu would be up here arguing claim construction on plain and ordinary meaning. I mean, how would this go down? That's exactly right. That's exactly right. And I actually think that's a more articulate way of saying what I was trying to say at the outset, that there are two different issues here. There is a simple sufficiency argument, which is, if we have hashed LOTEC, and there are literally groups of millions or hundreds of thousands of instructions associated with a LOTEC, can that be particular given a plain and ordinary meaning? That's a separate issue. It's a sufficiency issue. We've argued that way. This is a good segue, then. So we have Dr. August's testimony and your own documentation, where he testified that the chances in which a prediction will be associated with more than one instruction is 0.1%. Actually, Your Honor, I'm glad you brought that up, because one of the things I want you to do is, like the Cleveland Candeliers, if you look at Worf's brief in pages 17 to 18 and page 27, which is the point at which they're making that characterization of his testimony, and I think I've got it correctly, but it's 17 to 18 and it's 27. And I'd like to answer this question very specifically. You will see that there's a quote provided to you. The quote is, A and B, with the words, only when, inserted into the quote. And it's the only when that's inserted into those pages that would allow someone to reach the conclusion you just reached about Dr. August's testimony. But if you go to the testimony that's in fact cited at appendix 2239 to 2240 and 2237 to 2238, what Dr. August said is, no. They have to 100% of the time. They are associated with a group 100% of the time. Where is the 100%? I'm looking. Right. I thought he says 99.98. That is aliasing, Your Honor. And that's why hashing and aliasing, as Dr. Conte admitted, at A2516, are two different things. We hash 100% of the time. Our millions of load instructions are associated with load tags all the time. And this only when, which is key to communicating the argument that Your Honor just articulated, isn't in the testimony. And in fact, if you read Dr. August's testimony, what he says is, yes, there's aliasing 1% of the time or so. But there's hashing 100% of the time. And 100% of the time, the load instructions are associated as a group with a load tag. So how do you define aliasing and then how do you read this testimony in conjunction with that definition? The best I can do is if you actually look at A2516 to 2517, you'll see that Dr. Conte admits that hashing is different from aliasing. Aliasing is actually irrelevant to the particular limitation we're talking about today. Aliasing is when two different load instructions actually misspeculate with two different store instructions. And they're updating the same prediction at the same time because they happen to have the same load tag. And actually, this is why this only when is very important. Because what Dr. August said is, no, we hash 100%. Apple hashes 100% of the time. When it hashes, all of the load instructions are associated with different load tags. The fact that aliasing occurs a small percentage of the time has nothing to do with whether there are load tags that are hashed load tags that apply to the instructions. What about the documentation that says that your LSD predictor can be thought of as uniquely identifying load instructions? And that seems to imply from the technical documentation that that doesn't mean that it always occurs. Your Honor, first, it's identifying the LSD predictor, which is identifying data dependencies rather than misspeculations. What happens in the Apple system, which is actually more conservative and more inclusive, I guess is the best way to put it. If a particular load instruction misspeculates and gets a prediction, if a particular load instruction has a data dependency in the Apple system and it gets a prediction and a load tag, when that load tag comes up again, every single instruction that has that load tag will be prevented from speculating. And so while the 752 patent goes particular instruction by particular instruction, and Judge Bryson, if you look at column four, they talk about the purpose of the invention, which is to identify a discrete number of load instructions, store instruction pairs that are likely to create problems when they misspeculate. The Apple system actually is more conservative because if you have a particular load instruction that has a data dependency, it gets a load tag and then that load tag comes back around. Every instruction that has that load tag is prevented from speculating and it will prevent speculation in a circumstance where the 752 patent would allow it. Now, why? It's more conservative. The system, other portions of the system are more robust. It allows you to do that. It's a more conservative system. That's why particular is important to the claim. It's important in the specification. Now, I'm way over. Yeah, I do want you to reach, talk to us a little about vicarious liability and not on the legal questions, but just on the evidence. And, Your Honor, if I could just address that and then just a minute or maybe 30 seconds or so on the question of steely and summary judgment, and I can do it in whichever order you prefer. Let me go to vicarious liability first because they're relying. I mean, there was a question for us is what was the evidence that the jury could have relied on in concluding that there was at least the demonstrated capability of infringing in Texas? And, Your Honor, I think the key here is to look at appendix page 3924 to 3925. And what happens here is this. Early on. Let me just reach the 3920. I'm sorry. What was the 3924 to 3925, Your Honor? Thank you. And if you look at 3924, you will see that Dr. Conti was asked a very broad question about what these waivers were capable of doing. And there was an objection. And you'll see, were they capable of executing instructions? Were they capable of functioning? And there's an objection. The objection is sustained because Dr. Conti has not done any testing himself. He hasn't identified what the test port can test for. It isn't in his expert report. Then we go to the next page and he's asked a question about the test ports. He answers it generally, but he never says again what the test port can test for, whether it was ever used to test for anything here in the United States or anywhere, and whether that test could tell you whether the waivers were capable of performing program instructions. If he had gone to the next question, which would have been could they execute program instructions? Were they capable? We would have been right back to the question we objected to on 3924 and he wouldn't have been allowed to answer it. So the record as it stands, and this is why we hope, we suggest that reading 3924 and 3925 together are key. Because what ORF has done in its brief is it's excerpted the very bottom of page 3925 as if that answer existed in the abstract and said, see, this is enough. Wait, he says that you test every chip. And so what you're saying is he never went to the point of saying that you have to test it before you export it? No, Your Honor. He actually, the problem with this, and this is what the judge identified, he never said he said it's tested. He didn't say what it's tested for, what the test is, whether it's capable of performing program instructions. And in fact, if you look at 3924... He does say all the functionality is present, right? That's precisely what he was precluded from and why I suggest that if he were asked the next question, the same objection would have been... But what he says was, it's quite close. I understand my, every two years, the chips, you use it to test the chips to make sure they work, to make sure they're capable. And Your Honor, if you go back just one page, look at the question at line nine. Did you reach a conclusion in your report as to whether after printing in Austin, the functionality, circuitry, and design are established? Yes. What's the basis for that? And then that's what's excluded. And so I think reading that one line, and again, I would be arguing to you in any event that that one line doesn't tell you what's being tested for. Is it to test whether the power will go on? It doesn't suggest that there's any program instructions that can be executed. That, I would be arguing to you, is insufficient as a matter of law in any event. But when you read these two pages together, and you realize what has occurred, which is the judge has stricken an excluded testimony about functionality, circuitry, and design, and whether they're established, because he hasn't disclosed it, because he hasn't done the test, because he hasn't described the test, that's insufficient. So I think one final point on that, Your Honor, and then just two quick points on the summary judgment issue. On the legal issue, I know you wanted me to address the factual issue first. But the legal issue is important because the Myers case, the Supreme Court case, says that if you're going to impose vicarious liability, it needs to be something more than direction and control. They actually literally use those words right out of the restatement. Akamai is direction or control. And what they say is required in addition is an agency relationship, a principal-agent relationship, where one person holds the other out as their agent, and the other acts as the agent of the other. So do you think Akamai's characterization of method claims as being governed by, among other things, direction control is wrong and inconsistent with Myers? No, for this reason, Your Honor. Akamai actually comes right out and says that divided infringement is different than vicarious liability. Vicarious liability is saying that someone else is directly infringed, but I'm going to impose liability for that upon you for some reason. So if you accept that Akamai is correct and we can have divided infringement, then if I'm being charged with infringement based on making a device and I make, let's say, the case for a phone and then I contract with you to make the rest of the phone, then I'm liable for infringement for the entire phone. But if I contract with you to make the case and the rest of the components of the phone, then I'm not liable for direct infringement? No. Am I missing the correct distinction? Yes. And Your Honor, Akamai says there's a distinction. Akamai at 1022 says that vicarious liability is a misnomer for the joint and divided infringement issue. Well, I understand that. But my question is, are you saying that as long as I play some role in the infringement by making a portion of the device, that Akamai covers me? But if I contract out to you to make the entire device, Akamai and the law generally does not cover me. I'm not an infringer. No, but I think this is the precise explanation. I think as you've just posed the hypothetical, it's as I understand it, an apparatus claim, not a method claim. Correct. Akamai is dealing with... I understand. But I thought you were saying that... Well, go ahead. And Your Honor, here's the second part of the answer to the question. Why should Akamai, the final Akamai, I don't know, some people call it five, some people call it six, but why? I mean, that is when the court turned to look at the definition of 271A. And that's correct, Your Honor. So it wasn't just saying, let's look at induced infringement of method claims. The Supreme Court told us to go back and rethink our definition of infringement generally. Your Honor, I agree. But if you look at what the opinion says about the difference between vicarious liability and divided into an infringement, it makes the distinction that I think I'm trying to make between method claims and apparatus claims. That's the answer in part to your question. But Judge Bryson, there's a second answer to your question, which is 271B... Well, I would be liable for inducement, no doubt. But I'm focusing on 271A as Judge O'Malley. And Your Honor, if in a supply contract context, if entering into a supply contract and giving someone specifications is enough to become vicariously liable, no one's ever going to bring a 271B or 271C claim again. And in fact, what happened in this case is Worf abandoned the indirect infringement claims to avoid issues of intent that would be implicated by 271B and 271C. But do you agree with the premise of my question that if I made the case and contracted with you to make all the components other than the case, that then I would be directly liable under 271A, but not if I didn't make the case? No. You don't agree with that? I don't agree with that. I wouldn't be liable in either event? No, because the direct infringer is me as I make the case. You've contracted to have... No, I made the case. You made the components. All right. All right. I may have it reversed. All right. That's fine. You're the direct infringer. That makes it easier. I've actually asked you to directly infringe. The question is, am I vicariously or indirectly liable? The answer is there are two different boxes to put this into. One is the question of indirect infringement. That's 271B and 271C. A second box, which they're now trying to put these pizza-sized wafers into, is 271A. You are the direct infringer. When can I be directly liable? That's where the Meyer Supreme Court case, quoting the restatement, explicitly says, if you're going to make someone vicariously liable for someone else's act, then it has to be a principal-agent relationship. This contract explicitly says... No, but that case predates a lot of changes to the restatement, and we said in Akamai that the point is attribution, and that's what we should be looking at, and that vicarious liability is a misnomer because the concept is attribution, and how can one's act be attributed to another? And I think, Your Honor, how can one's act be attributed to another so that that person is performing all the steps of a method claim? And I would suggest that if that was extended to your example with an apparatus claim and to vicarious liability, I'm not sure who would continue to pursue a 271B or 271C claim, but more importantly... I mean, that might just be the reality. I think it would be inconsistent with Meyers and the Supreme Court precedent, and that is what we said to the district court judge. You get your extra minute. The last minute is this. Quite apart from everything we discussed, there was a pre-trial summary judgment rule. It was based on a claim construction of prediction that narrowed the term prediction. That is, as you know, we suggest legal error. It is basically taking the plain meaning, a plain meaning which we all agree the term has, and then implicitly, as the district court said, narrowing it. But even if the claim construction were correct, we had Dr. Caldwell, the chief architect of the Pentium Pro, come in and give a declaration that described in detail how the Steele reference satisfied the limitations of the claim, no matter what the definition of prediction was, and the judge simply resolved that issue himself at page 831. He basically said... But didn't he say, even assuming? Didn't he go then and say, even assuming we accept all of that expert testimony? No. What he said is that Apple's experts appears to have, it appears that Steele has an error in the manner in which the process is executed, even though Dr. Caldwell said there's no errors, this is how it worked, even though the named inventor, Simon Steele, said this is how it worked. Even though... But he said, even assuming one might infer that such overwriting occurs and constitutes updating. And then he went on to conclude that Steele still doesn't describe a tag replacement system that would constitute prediction. And that's error for two reasons. The first thing is, if that type of updating and overwriting is specifically described in 752 pen as updating, it's described as temporal locality and deletion with a subsequent instruction coming through. And so as a matter of claim construction, it would be wrong. But even if you set aside the claim construction issue, that was a question for the jury to resolve. What you have on the record before you is this. You have Dr. Caldwell's testimony, Dr. Caldwell's description of what Steele does, the inventor's description of what Steele does. It says, yes, it does precisely what Dr. Caldwell says. And it overwrites tags as the process moves on. And you have the judge resolving that factual dispute because he thinks there's an error in Steele. But this only relates to anticipation. Did you then argue an obviousness case relating to Steele? Well, Your Honor, we argued an obviousness case that had different aspects of Steele, but because the district court had decided that Steele didn't disclose the required prediction, we were precluded from arguing both anticipation and obviousness based upon Steele disclosing the prediction. So the answer is this summary judgment ruling precluded us from anticipation of Steele. It precluded us from an obviousness theory that we had articulated that was based upon Steele disclosing a prediction. And all of this question about the prior art was not only critically important to the invalidity case, it was a big part of the damages case as well. Can I return you to particularity? As painful as it might be to replow this ground. But one of the things that's troubling me, and we touched on it briefly before, but I think I never really got a resolution. The judge said, and it sounds to me, looking at the timing of all of this, that a lot of what happened happened in a real hurry, in the middle of trial, the sort of hurly burly of things that ended up getting decided probably and written overnight between the motion, your response, the judge's order, and then the text order that came out the next day. So there's some rough edges there, obviously. But what bothers me is that you've got an instruction, pardon me, you've got the construction by the court that is the one that you latched onto, which is the single load instruction. But then when we get to the JMO, I find single at least open to some ambiguity as to what it means, because it doesn't say single and no other. So when we get to the JMO, sure enough, the judge says, well, the meaning of the term is, in effect he says, and the evidence is sufficient to show that a reasonable jury could conclude that the prediction was associated with a particular load instruction, even if that same prediction could be associated with other load instructions. All of which leads me to believe that at least if the judge is being consistent, that he believes that the single load instruction construction was consistent with Worf's view that this load instruction could be accompanied in the load tags by many others. Why is that not right? Your Honor, I would say these things. First is where you began was there is some confusion if you look at the different things. I don't think anybody disagrees with that. And the answer is there surely was. Let me try to unpack the confusion as best I can in answering your question. If you look at A144 to A145, we know the following things, and I don't think there's any dispute. One is Worf brought the motion to exclude our expert from testifying. No one disputes that. The second is we said, no, it's plain meaning. This is a factual question. But if you're going to construe it, it means a single instruction. And here are dictionary definitions. And here is what the specification says. Worf came back and said, no, no, no, it can be a group. Which it had to do because the undisputed facts are that we hatch. And we have a limited number of load tags. And it said it can be the group, not because particular had a different meaning, but because of the word comprising. So A1 is a separate argument altogether. But you get to A144 and 145. And I think this was something that Judge Pross asked me about. You have him saying there's a fundamental claim construction dispute. You have him saying that I'm going to construe it. You have him acknowledging Worf's argument that we have ways to go to Judge O'Malley's original question that got started down the particular path. And he doesn't decline to rule because either of us has ways. He said, no, I'm going to rule. And what he does then is he says, here are the dictionary definitions, both of which, Your Honor, support a single unique instruction. And that is critically important because it's consistent with the disclosed embodiments, every single disclosed embodiment in the patent, every single one of them. And then he says, here's the comprising argument, but the comprising argument is not legally correct. And I construe it to be a single instruction. Then we get the, but I'm not going to instruct the jury. And you should not emphasize the word particular. So we try the rest of the liability case only takes about a day and a half. But the very next day in the text, he comes back and he says, you have waived. Yes. And that's within 24 hours after he rules, having decided we hadn't waived initially, then deciding. Final view on the matter is that you waived. And Your Honor, that would be an abuse of discretion. The idea that you find on Wednesday, no one's waived. You then offer a claim to instruction. Well, it's only an abuse of discretion if he's wrong. It's not an abuse of discretion for him to change his mind. It's not an abuse of discretion for him to change his mind, but it's an abuse of discretion precisely because of the circumstances you describe. So you get to the jam well. And I think it's a fair argument. He's changed his mind. Right. But the jury never got either of those two claim constructions. Well, if he had gotten the one that he settled on in the jam well, you wouldn't be here, at least on that issue. Yeah, I mean, I clearly was. You clearly would have lost on that construction. If he had given that construction, what we would be here on is arguing to that that claim construction was wrong. Right. And I think that's why I think at the outset, and I think Judge Post may have articulated it more clearly than me. There is a simple sufficiency of the evidence against the plain meaning that does require, as the chief said, you decide what the plain meaning is. You have to decide what the plain meaning against what the judge said in a 144 to 145. You have to decide it against what we said was the plain meaning from the outset. And you have to consider what he said in the jam well ruling. If the plain meaning is, as we say, a single instruction, then there's insufficient evidence with the verdict, no matter what the waiver issues are. And that's why, you know, a fundamental question here is in a patent that was in a crowded field of prior art. The IBM patent and the Beck patent were extremely close. The district court said we granted summary judgment of no willfulness. And you have a term particular that's in the specification 20 times and in the claim and in a portion of the claim that has an antecedent basis. And the judge construes it to be consistent with our dictionary definitions. It says a single construction. Can the verdict be sustained? We would suggest that the verdict cannot be sustained. It should be reversed. At a minimum, we suggest a new trial support. May it please the court. On behalf of the Wisconsin Alumni Research Foundation, Morgan Chu, and I'm here with my colleagues, Chris Abernathy to my immediate left and Gary Frischling to the far left. Let me discuss the particular issue first. There was a clear waiver. A clear waiver which must be assessed by abuse of discretion. The Apple request for a jury instruction or a claim construction using a single instead of the words of the claims not particular. Let me ask you. I understand your argument. We understand your argument. But what about the point that let's assume there was a way. I mean, let's assume this issue had never even come up. And both parties adhered to plain and ordinary meaning. And we get a jury verdict. Don't we have to then construe either whether your view of the plain and ordinary meaning or Mr. Lee's view of the plain and ordinary meaning, which of those is correct in order to evaluate the sufficiency of the evidence? No. If it came up exactly that way, then it's clear that both sides had waived any further construction. But how would we evaluate the evidence without ourselves understanding what the parameters of the claim are? Okay. Let me do it with the words of the particular, with the actual claim language. So, it's a prediction associated with the particular load instruction. I'm using load instruction instead of data-consuming instruction. Okay? 99.98% of the time, there is that association. And there's no meaningful dispute on that. Dr. August basically agreed. Mr. Williams, an Apple engineer, agreed. Here's the point about the single argument today. After Wharf had wrested its case in chief and after Apple had wrested its case in chief during the liability portion of trial, it was after both parties had wrested its case in chief that Apple asked for the first time the use of the words a single to interpret the particular. And I can give you the particular side. But before you do that, I'm interested in the answer to Judge Prost's specific question also. And what I'm interested in, suppose contrary, you're arguing the merits now, which I understand. But suppose that contrary to what happened, there had simply been an instruction, plain and ordinary meaning, and the argument made to us on appeal was insufficient evidence. What do we do? Do we say there is a range of possible plain and ordinary meanings? And we're not going to decide what plain and ordinary meaning means. And therefore, if something fell within this range, we would sustain the jury's verdict. Or what? Do we construe the actual meaning at that point? As applied to the facts of this case, whether it's the words the particular or a single, there is this undisputed fact that there is that association. Prediction associated with the loaded... Yes, I understand. But I'm looking for a more, to the more abstract question of what is our modus operandi here? What should we do by way of considering a situation in which there has been a plain and ordinary meaning instruction and construction, and it comes up as a challenge to the sufficiency of the evidence? Let me focus on a way which we disagree with, that Apple could win, and that is if the construction, and it's not just one and only, but it's one and only every time. So, if there's one time out of a thousand where it is not associated with one and only instruction, it's Apple's position they would win. They would lose under everyday meaning, any meaning that one wants to give that's reasonable with the words the particular or the single, or even one and only, because that occurs 99.98% of the time. What occurs? They use one and only instruction? No. What occurs? Well, now we're getting into a losing. No, the factual record is that there is a prediction associated with, I'll say, a single load instruction, and only a single load instruction 99.98% of the time. And it's because of a number of things. There are only 192 entries in the table, so talking about millions of instructions makes no sense. Hashing is irrelevant to this. So, factually, there is always an association except for a tiny, tiny percentage of the times. So, for 99.98% of the time, there's infringement. Can you give us your best record sites for what witness testified? Oh, sure, sure. First of all, let me give you Apple's Dr. August's testimony on this. It's at Appendix 2239. The chances in which a prediction will be associated with more than one load instruction is .0-.0.1%. Okay, now that's the testimony that I referred Mr. Lee to, and he said, well, that's irrelevant because that's talking about aliasing. What's your response to that? Aliasing just means when there's association with two load instructions. There was no dispute about what aliasing means. And then there's the clear testimony by Dr. Conte about the 99.98% of the time. It's discussed at length in our brief. There's also a reference to the Apple engineer, Mr. Williams, who testified to the effect that it was less than 0.1%. So, that would be less than .001 times. So, it's not largely in dispute that well over 99% of the time, there is an association with one and only one. Now, one other point. The testimony here, and even in your closing argument where you were talking about a 99.1% of the time, you were talking about aliasing, right? Aliasing is when there's an association with more than one load instruction. So, the answer is yes, but it's the same as saying that there is not an association with more than one load instruction 99.98% of the time. And everyone agreed at trial. Where is the linking between aliasing and the one load instruction? Because in 2240, and is this Dr. August? And so, if the jury is to credit this testimony, that would mean that for 99.9% of the time, the load, the prediction and entry of the table is associated with one load instruction, correct? And the answer is no. If the jury were to credit this, it goes on, and the witness is saying no to those questions, not yes. So, I'm assuming I'm missing something. I want you to tell me what it is. Dr. Conte testified. I thought you were referring us to Dr. August's testimony. I did. Dr. August is Apple's expert. Right. So, he did fight on this in the sense that he was trying to picture it differently. So, let me give you the setting, and then I'll give you Dr. Conte's side. The way to look at this is, was there substantial evidence? There was a big clash, largely between Dr. Conte for Wharf and Dr. August for Apple. They relied on lots of documentation. Significant evidence was put before the jury. And so, both sides had a factual clash on these issues, and the jury ruled in favor of Wharf. So, it ends up being a substantial evidence question. Now, let me turn to some sites of what Dr. Conte said. Dr. Conte had said, based on his own calculations, Apple- Why don't you give me the page number so I can follow you through. Yes. If I say A, that means appendix. Yes. A, 2517 to 25- 2515 to 2517. And in particular, at 2517, starting at line 17, he explains, Dr. Conte, it's greater than a 99.9% chance that the piece of information you use is going to be unique. That's at 2517. Those are just examples. I know, but actually, I think Mr. Lee responds to this in the briefing that maybe I've got the wrong thing, but if you keep reading, that seems to be explained or qualified to mean something different than if you just look at it in isolation. And indeed, what Apple does, the Apple engineers are smart. They work real hard to come up with a good nickname. They wouldn't use a zip code. Why would they use a zip code? They use something like a street address. That was that uniquely identified for 99.98% of the time. The zip code was an analogy that Dr. August used. I think it makes a lot more sense to see how the system actually operated. And it operated, I'll round it off, far more than 99% of the time. The prediction was associated, as Dr. Conte said, with a unique tag or with one load instruction, and there are many, many other citations in the record about that. As I understand Apple's argument, it is that that may be so in the operation of the system that as a given load instruction comes in, it's only that load instruction that is the subject at that moment of the prediction. However, the prediction applies not just to that load instruction, but to every load instruction that is covered through hashing by the same 12-bit address, or truncated address. Why is that not an appropriate way to look at the question of whether this association applies to more than just one, in the typical case, instruction? There are two reasons for that. First, in the patent itself, the 752 patent at column 6, beginning about line 61, there is a discussion about using a partial address, which basically is what hashing is doing. It's dropping off part of the address. Similar to what we do with patent numbers. We drop the first four digits, we just use the last three. It says, referring now to figure 1, an ILP processor suitable for use with the present invention includes a memory. Having a portion holding a stored program at a plurality of physical addresses, here depicted as XX1 to XX6, where the values XX indicate some higher ordered address bit that may be ignored in this example. They are discussing doing it the same way. This is a discussion of hashing. It's like dropping off the higher order bits for a patent number, or the first four digits. Point number one, is this really a discussion of hashing, or is it just truncating the addresses for purposes of the discussion, i.e., just not having some very, very long address for purposes of explanation of how the invention works? This is a discussion, when you drop the higher order bits, that's exactly what's done in hashing to make the system more efficient. The goal is not to alias, or to have an association with two or more load instructions. The goal is, for the largest possible percentage, never to alias, or not to alias. That's what the goal is. If you look at the patent, that's answer number one. Answer number two is, the fact that there is this clash. In other words, Dr. August made similar arguments to the jury, saying, well, somehow there is not this prediction association because there's hashing. Dr. Conte disagreed. They had extensive testimony about it. There was argument about it to the jury in closing argument. The jury came out in favor of Whorf on this factual dispute. Let me ask you about something in the specification that Apple highlights. On column 11, at the first few lines of column 11, there's a reference to the... Well, the predictor circuit reviews a prediction table shown generally in figure 5 to see if the, in the critical language then is, particular instruction identified by its physical address is in the prediction table. Why is the reference to physical address not an indication that the particular instruction is the whole single instruction, the unique instruction with that physical address? It could be, but this doesn't define the claims. In other words, you could... But the term particular instruction shows up in the claims, and so why shouldn't we assume that that term is being used in the same way? Because it's also used in the context of the column 6, where it's plainly discussing a situation where the full particular address is not there. Second, if you look at the claim language, there's nothing that says in the claim language that you have to have the full particular instruction address. I'm using the word full, right, because it's just an association of a prediction with either the particular load instruction or, as Apple would have it, a single load instruction. But the term, I think, in my understanding at least, you tell me if this is wrong, but the term physical address typically refers to the full address, not some truncated form. Is that correct? I don't know one way or the other. I just don't know one way or the other. Because hashing functions are used throughout programming frequently, not just in this context. Is Dr. Conte saying that there are actual load tags that have only one instruction? Yes. Other than him simply saying that, what is the other evidence that would indicate that? He went through the code, the detector circuit. The detector circuit is made by what they call an RTL code. It is a hardware rendition because these are hardware claims, but it's similar to what I think the members of the panel will understand source code to be. It's the exact technical way in which the circuit operates, and he discussed that in great detail before the jury on this and a variety of other issues. Well, you say he discussed it in great detail, and I'm having a hard time finding the precise places where you think he most clearly says it. He says in one place Apple takes the load information and it produces one tag. You take in that load, you produce that tag for that load. So are you saying that they're saying that every single load only has one tag? No. I am saying an infinitesimally small number, less than 1%, can have more than one tag. And all that would mean is that 99.98% of the time there's infringement. Well, but I think Judge O'Malley's question, and I had the same question, is a slightly different one, which is, are there programs in which every single load instruction has its own load tag? Now, you make that argument at page 17 of your brief in the first full paragraph, but you don't say that there's any affirmative evidence to that effect. What you say is Apple has not contended that every program has multiple loads associated with every load tag, which is reversing the burden of proof. So I wonder if there is evidence that there are programs that would infringe, according to you, even under their construction, because every single load instruction has its own load tag. First of all, I think I need to just go back to the 99.98% if I'm understanding the question. Maybe I'm misunderstanding. Suppose you have a very tiny program that only has 300 load instructions associated with it, and every single one of those 300 load instructions has its own load tag. That program would infringe even under Apple's construction, correct? Yes. Okay. And I think to Joe O'Malley's question in mind, too, is whether what you mean to be saying in this paragraph on page 17 of your brief is that you have evidence to that effect, that there are such programs and that they infringe. I don't think there was any evidence of this very small type of hypothetical program. Okay. Where there is a unique load tag under all circumstances for every load instruction. All right. Okay? So, go ahead. If you have something in particular, before we exceed time more than we ought to, I wanted to make sure you reached the vicarious liability questions. Let me then. I had a response to that. Let me then go there. I didn't want to sit down with the particular. Okay. So, on vicarious liability, if you're really ready to turn to that. Yes. I guess there are two parts. And the first part is really an evidentiary matter where Mr. Lee pointed us to the testimony which was kind of rejected or not allowed with respect to the witness saying this is what was happening because he wasn't there for the testing. So, do you agree with what Mr. Lee said? And do you have more evidence or other evidence or other testimony in that regard? I respectfully disagree with what Mr. Lee said. So, that is the testimony. Well, I'll go to the exact testimony. The fact that a particular question was rejected too and was sustained doesn't tell us what actually came in on the record. Okay. Here at A, 3924 to 3925. Question. What's your basis for concluding that all the circuitry and functionality is present in the chip after printing? Objection. Followed by colloquy. And then the witness is told by the court, you can proceed. Dr. Conte then says, quote, so there is a test for it. It's called JTAG. JTAG is an IEEE standard. It's IEEE standard 1149. My vice president of standards recertifies this every two years and you use it to test the chips to make sure they work, to make sure they're capable. You do that on every chip. A couple things to note. He was president of the IEEE. That's why he's referring to my vice president. So, he's personally familiar with these standards. There is no dispute that the wafers manufactured in northern Boston, Texas, in fact, have these test ports. And Dr. Conte has other testimony that relates to this. Let's go to... Okay. So, he concedes he didn't do any testing himself. And so, the judge says you can't talk about personal testing. Correct. But then he says these all have test ports, which means they're capable of being tested. Right. And he says that the IEEE standard tells you how to test and all chips have to be tested. But is there any basis for him to say that that testing actually occurred in the United States? Since he wasn't on the premises to see the test, but the important point is the claim construction focused on whether the infringing circuits were capable of. That's the claim construction. And it was without objection by Apple. So, naturally, Dr. Conte's thrust of his testimony on this subject was capable of. And the main Apple argument was that you need to have bumping and fusing of various kinds. If I go to the end of the page I was just reading from, 3424, there's a question on to 3925. And does that require the blowing of the fuses? Answer, no. Now, let me go to other Dr. Conte testimony. This is now at 2959. By the time you're a wafer, all the claim circuits are here. They're already built. It's like you build a house. I don't think we have 2959. Is it 2959? I'm sorry. I was looking at 3959. Oh, I may have missed both. 2959. 2959. Okay. No, you didn't. I misheard. Okay, go ahead. Okay. By the time you have a wafer, all the claim circuits are here. I already did 3924. 3929. Question, where is the functionality created and existing for the Austin chips? Answer, it's created in Austin. Question, and does that have anything to do with when fuses are blown or when bumping occurs? Answer, no, no. Question, what does it have to do with? Answer, it has to do with the circuits that are laid down in Austin. Going to 2995, and this is on cross-examination. Question, and before bumping happens. 2995? 2995, excuse me. 2995. Question, and before bumping happens, you can't apply power to the circuits, right? Answer, actually you can, but you can do that on a test fixture. 2996. Question, still on cross, and it's correct that bumps are what allow the power to the circuits, right? Answer, as I said, you can do testing without having to bump first. That's just a sampling of the testimony. He is demonstrating in those few small examples the capability. This was- Can you just explain- Wait, what about the next, I'm sorry, what about the next two questions? You have no evidence that any such testing has been performed in the United States, right? And he says, I don't know one way or the other. Yes, yes. So, well, the answer correctly there, but actually proving testing wasn't a necessity. The necessity was proving capability, and the A7 had about 3 billion transistors. Every single one of them was laid down in Austin. They could be electrically tested. That's the purpose of the JTAG port. And he did provide background on what normally happens. It doesn't go directly to capability, because the capability goes to the RTL coded circuits that are laid down in Austin. All right, with that? I'm actually not- Okay, please. Can you just give me- Why are you saying that- There's a lot of emphasis on that there were these test ports in Austin. Are you saying that because we're dealing with capability, the capability is required irrespective of whether or not anything was ever tested in Austin or anything was ever done in Austin? I would say it differently, and let me try and answer your question directly. On the capability question, the question is, what was done in Austin, did it make the 3 billion transistor circuits capable? The answer is yes. That's what Dr. Conte testified to about all the circuits being made and manufactured. No other circuits for the chips were added later, period. So then Apple made the argument, well, you cannot electrically test them. And that's in answer to your question, Your Honor. That's where Dr. Conte says, what are you talking about? There are these test ports. You can electrically test them. Generally, you do electrically test them. But he also says, I wasn't a witness to the actual electrical testing. But that is off the point. We're on the question of whether the circuits are capable. It was more responding to an Apple argument. I hope I clarified that. So he's saying that the circuits are capable without bumping? Yes. Yes, or fusing. It's a bump. Capable if a testing device is used with them, a specific testing device. No. Actually, they're capable. Okay. Well, but they don't work unless you have the particular testing device to see if they are capable, right? I mean, they won't work without the testing device? No. The question is, we're talking about just a portion of these chips, the LSD, the load-store detector. And those circuits, as they are laid down, are they capable of doing the load-store detection? That's the question. They do not have to be electrically tested in order to do that. Okay. Because the client construction is just capable. Again, it was undisputed, no objection to it. So the main clash is whether they're capable of. One witness says yes, the other says no. So let me give you an example. Let me ask it this way, the question that's bothering me. If you take the wafers without having any testing equipment attached to them, presumably they can't be made to work in the form that they are. They're just not going to work unless you hook them up to a testing machine, right? So in that sense, before you hook them up to the testing machine, they're not capable. They're capable only if you put the rest of the components together with them that allows them to perform the way they are intended to perform, right? This court has actually addressed it in a couple of cases, and hopefully you'll find this to be a direct answer. In silicon graphics versus ATI, cited in the briefs, it involved a rasterization circuit. And the district court said that circuit does not infringe because you need to add, I think it was an operating system, for the rasterization circuit to rasterize. This court reversed the district court and said, no, it was capable of rasterizing. If I were to simplify it, let's say one has an allegedly infringing microwave oven. It's got an electrical power port. Is it capable of warming up food? Yes, it is. I could say yes, it is. In the box, it comes, it's got the electrical port, but in fact, if you want to look at it from another perspective, you in fact have to plug it into the outlet. So the silicon graphics case stands for the proposition that even if something else needed to be done, it is still capable of. The same holding, effectively, is in this court's FinGen versus secure computing. Right, so there's the silicon graphics FinGen line of cases, and then there's a line, obviously, to where you get to the Nozomi case. Okay, so how do you distinguish your circumstances from the circumstances in Nozomi? If you're referring to the Supreme Court case on the fear of housing, or are you referring to something? Referring to our case law. Okay. That talked about how you can define what the testing will tell you with respect to functionality. Well, again, there are two answers. There's no requirement to test when the claim construction is capable of. As one of this court's decisions referred to an automobile that had a propulsion system. Can we stick to silicon graphics? Sure. That dealt with just adding activating. You're simply activating, whereas I think Apple's position here, and I don't know if you would disagree, there's testimony to support it, that what they're talking about doing in Korea, which is fusing and bumping, that's not simply activating it, it's making it functional. And if that were true, then I think you would agree silicon graphics would be distinguishable. So, or not. Well, first, we, with respect, disagree with Apple's position, and I don't think it would make it distinguishable. In other words, the rasterization circuit had no possibility, with a test port or not, to operate. And the question was whether it was capable. Was it capable of rasterizing? This court said yes, even though, and I think it was an operating system, was inadequate. And FinGen was to the same effect. One had to get an activation code to activate it, and this court said, no, there's infringement. Now, let me go to the... But there's a difference between just activating and understanding whether the functionality is all there, right? And isn't that why we needed more data with respect to what the testing would show and what happens when that JTAG port is accessed? Again, there's no need to access it to know that the circuits are capable of. If the claim construction said that there had to be some electrical test, yes, that would cause a different outcome. But that's not what the claim construction was. So, if I can go to the bumping and fusing for a moment. Okay. So, what do they involve? The chips are put in a package, and then they need electrical connections to the rest of the product. That's what bumping is. It's referring to solder balls where there's an electrical connection to the rest of the product. We have to keep in mind, this is not the operation of the chip that infringes. It's capable of. Fusing is done for a number, a couple different reasons. And what it is, it's like a little hardware switch or switches. And Apple uses these as an example to have security for software purposes because Apple doesn't want its iOS operating system to be used on processors that are made by someone else. So, the switches are pulled that said, Okay, now it could be used in its intended environment, which is the Apple iPhone. So, it's very similar to the rasterization circuit and what's going on in FinGen. I have some dated August testimony about this. And this is at 3643 at line 10. Question. And with respect to the fuses you mentioned, what is the importance of blowing the fuses? Answer by Dr. August. Well, there are actually components in the microprocessor in the die that aren't fully configured. There are some measurements that need to be taken to figure out, for example, how to interact with cache memory. And once those measurements are taken, the fuses can be customized and blown for that particular die. And at that point, we'll actually be able to communicate with memory. So, that actually activates part of the circuitry or completes some of the circuitry before that's done. So, what he's basically saying, similar to... Before that's done, there's no, it's not functional. Well, he does say that, but Dr. Conte's testimony is exactly the opposite. I'm pointing out that at least his testimony, Dr. August's testimony, is that this is activation very similar to what's happening in silicon graphics and in FinGen. The main point is all of the operational circuitry for which there was no dispute was all manufactured, put on the wafers in Austin, and at no other place in the world were any of the circuits for the entire chip put on, much less the circuits for the LSD, which was the... So, your position is, does not necessarily need any reliance on the J-port testing. Correct. Because the case was tried on the capable of jury instruction, that's point number one. And point number two on that, you had significant evidence being proffered by each side with different conclusions drawn by the two experts, opposing arguments by both sides, and there was substantial evidence to support the jury's verdict. I don't think it was possible, but we're almost getting close to the time we took with Mr. Lee. This is going to be a one-word answer, and I hope... No, no, no, I want you to go on. Yes, yes, yes. Just very quickly, there were allusions in the brief that I wasn't sure of, indicating that perhaps the chips from the Austin plant were not all of the chips at issue in the case, but I couldn't figure out whether that's true or not. That's correct. What percentage of the chips involved in the case are the Austin chips that were affected by this damages question, by this question? Roughly 40%. Okay, that's fine. Thank you. And you don't need an explanation as to where the other chips came from? No, no. Okay, then I'll go on. There was another piece to our discussion with Mr. Lee on precarious conditions, and that was more of a legal question. Yes. So the question on Steele and the summary judgment motion of anticipation... Well, first, I think that Chris was trying to get you to the point of, in Akamai, were we interpreting 271A for all purposes, or were we only limiting our interpretation of 271A for circumstances involving method claims? I think the fair reading was that when 271A was discussed, in the Akamai opinion, it was a discussion of vicarious liability, and the court basically said control and direction is applicable, and control and direction can be found by prior cases in two ways. Number one, agency, or number two, by a contractual relationship. And then the actual decision in Akamai says there's another third way. We know what we said about how we can show attribution, since we said vicarious liability is not the right phrasing. We know what we said there. The question is did we say it for all infringement analyses or only for method claims? I believe, looking at the language, the fair reading, because there was no limitation to it, was that it covered all claims, and there's another Federal Circuit case, Centillion Data Systems v. Quest. And in the Centillion System, Quest, the alleged infringer, argued preexisting law only applies to method claims, not to system or apparatus claims. And the Centillion Federal Circuit decision said no, we reject Quest's argument here, so that we can apply the law and apply it, as I said earlier, in connection with the Akamai decision. The order was Centillion was first, Akamai came later, so it had already been settled that the law for vicarious liability could be applied to system and method claims. Okay, so talk about the feeling. Okay. So I'll just focus on the claim construction aspect, unless there are going to be questions about other things. We start with the claim language itself, and there's a very detailed decision by Judge Conley. This is the static versus dynamic? Yes. Predictions? Yes. Okay. So, first point, if you look at the claims themselves, the last limitation of Claim 1 refers to a prediction threshold detector preventing data speculations for instructions. Where are you exactly? Claim 1, column 14, line 50. So it's subparagraph B of Claim 1. I'll wait until everyone gets there. Yes, okay. Okay. A prediction threshold detector preventing data speculations for instructions having a prediction, quote, within a predetermined range, end quote. And predetermined range would make no sense unless there is some updating or unless it's dynamic because all Steely discusses is having a flag when there's been a misspeculation. So we have this predetermined range language in the claims themselves.  There's a discussion about an object of the invention, and this is in column 4 at about line 31 where it reads in part that, end quote, object of the invention to provide a predictor circuit that may identify data dependencies on an ongoing or dynamic basis. So it's saying that an object of the invention is to be dynamic starting at about line 65. Maybe I'm wrong, but I understood Apple's argument to be that even if we accept that claim construction, even if static and dynamic are both encompassed, that Steely still doesn't, or at least that Steely still doesn't explain the tag comparison. Here's my understanding of the Apple argument that was based on Dr. Colwell's testimony. He was... That Steely had nothing to do with predicting, right? Isn't that what he said? That Steely's tag comparison does not constitute a prediction. That's not my understanding of their position. What I think Your Honor may be referring to, and it is addressed by Judge Conley's claim construction order, which is in the record, particularly around Appendix 19, addresses a lot of the arguments. And I should note one other thing. There was a Dr. Colwell declaration, but a fair amount of what Apple argues in its briefs have to do with Dr. Colwell's testimony at trial, which wasn't before the court in summary judgment. But even if everything was before the court for purposes of summary judgment, Dr. Colwell speculated as to how the Steely system might operate. He could not and did not point to any disclosure in Steely. He wouldn't draw a conclusion such as a trial. Well, I think that's the way it's supposed to operate. And he provided some testimony that some associations are overwritten. And what Judge Conley said was, well, that's just discarding something. That's not updating the prediction, as opposed to what is in the intrinsic evidence in the spec of the patent where you're incrementing a counter, decrementing a counter, or doing something else, which is always updating the prediction to make it better. So every embodiment in the 752 patent describes what I just described, a dynamic circumstance. Even where Apple says, wait a minute, part of the spec is not dynamic, and this is toward the top of number 14, starting at about line 3, where this portion describes incrementing, and then Apple quotes out of context in its brief a reference to waiting schemes or pattern recognition. But if one reads that full language about waiting schemes, as Judge Conley found, that not only does not support Apple's position, but it's really a description of something that is dynamic. Thank you. We have your argument. Thank you very much. We'll just wait four minutes, five minutes, and we'll get forward.  Yes. Thank you, Your Honor. Let me take it in reverse order and deal first with prediction, then with vicarious liability, and come back to the question of particular, which is where we started. On this question of prediction, when the briefing is all done, no one disputes that there's a plain meaning of prediction. It includes both static and dynamic. No one has suggested to you anything otherwise. No one has suggested that WARF was its own lexicographer. No one has suggested their specification was developed. What Judge Conley said is there is implicitly in the specification a requirement that you limit the plain meaning to dynamic, and that's wrong for two reasons. One is the claim doesn't limit itself to dynamic. It just says prediction. The second is at column 14, when you consider the argument just made to you, Mr. Chu said that the system of the 752 patent requires incrementing and decrementing. That's the dynamic aspect. Column 14 says you don't have to increment, and it describes a weighting scheme, and a weighting scheme could be dynamic. Are you saying that Steely anticipates because there's any static? We say for two reasons. Any static functionality? The district court found that Steely does not allow for updates, right? No. The district court actually disputed Dr. Caldwell's testimony and Mr. Seoy's testimony that it, in fact, allows for updates. One of the things the specification of the 752 patent says is there's temporal locality, that is, if there's an old misspeculation, we can replace it with a new one. Right, so it has to have a dynamic capability, right? That's exactly what Seoy does, and that's the disputed issue that the jury should have resolved rather than the judge resolving it. But at column 14, and I want to do this quickly to stay within my five minutes, a weighting scheme is this. There may be a misspeculation that occurs early in the program. It's not a big deal, so you give it a three. But there's a misspeculation that can occur later with a pair that is a big deal because it could affect the performance of the processor, so you give it a seven. You have a prediction threshold indicator of five because it says which ones are important and which ones aren't. That's static. That's a weighting scheme. And when the specification says you don't have to increment or decrement, you could have these weighting schemes. They could be dynamic too, but they also could be static. And that's why what the argument that's being made to you is that the plain meaning could include dynamic and static. There's no lexicography, but we think the preferred embodiment should somehow limit the claims not just to dynamic, but to a particular type of dynamic. And that wouldn't make any sense as a matter of law. And what Dr. Caldwell explains, and this is the last thing I'll say on this issue, is no, if you read Steely, it does two things. One is it tags loaded and stored instructions that have misspeculated. And when you get to a subsequent misspeculation with a different load store pair, it tags them. But when you get to a subsequent misspeculation with the same load, it will update. It's the temporal dislocation that's discussed in the 752 patent. However you judge that argument, it should have gone to the jury. It was not for the judge to resolve. On the issue of vicarious liability, let me save to answer a couple questions quickly, Judge O'Malley, that you raised. The question of whether Akamai is 271A for all purposes has been answered post-Akamai by this court. In a number of cases, there's a lot of case at 838 said second, at 1339, 1349, that basically says we're applying the proposition to joint infringement of method claims, but not the system claims. It's drawing, it's answering the question of whether it applies to all of 271A. Second point on vicarious liability is this. The answer to your question is, there is the FinGen, Silicon Graphics line of cases. There is the Nizomi cases. Here are the distinctions. The first is that the Nizomi cases require some structural modification before you can use them. That's what bumping and fusing is. It's a structural modification. You can't use them. The second distinction... That's the key question I'm trying to figure out is, are we just talking about turning on the functionality versus modifying the functionality? Your Honor, this will get to my second, my last point on this, but let me just finish one thought on the distinction in the cases that Your Honor identified. In FinGen, Fantasy Sports, Silicon Graphics, the user could turn them off without structural modification. They had to insert a passcode. They had to buy something off the Internet, but the user could make it happen. The user can't make anything happen to these wafers that are pizza-sized, not fused, not bumped, not cut. That's why they're going to Samsung in Korea for the purpose of being bumped, fused, and cut. To go to the point that Your Honor is raising, which is my last point on this, is the testimony that Mr. Chu cited to you can be addressed in this way. The requirement is just not capable. It's capable of executing program instructions. It's a specific capability. All of the testimony he cited to you before pages 3924 and 3925, which I discussed with you, all it says is you can test. It doesn't say what for. It doesn't say whether they're capable of performing program instructions. That is the key. I agree with Mr. Chu on that. When you got to that question... So your point is that the functionality is all present. It's just not... you just can't access it. No, Your Honor. Our point is this, and I should have been more precise. The transistors and wires are there. That's what happens during the lithography process. That's not enough. Until you bump, fuse, cut, you can't use the chips. And the testimony that Mr. Chu cited to you, all of which was before the judge struck Mr. Conti's testimony, none of it says anywhere, anywhere, that those wafers are capable of performing program instructions. It doesn't tell you how to load software onto those wafers. It doesn't tell you whether software was loaded onto those wafers. It doesn't tell you whether they were capable of performing at all. The place where the rubber met the road was at page 3924 to 3925. And what Mr. Chu did in his argument is the same thing they did in their brief, and that is that you ignore the page and a half that comes before when the judge says no. If you didn't test it, if you weren't there, if you don't know what the test was for, I'm not going to let you say what it was capable of doing. That is insufficient as a matter of law. Last point is on this question of particular. And I think, Judge Bryson, as you basically framed the issue, which is let's set aside all of the issues that happened with worse motion, the claim construction, the wafer, no wafer, then wafer, then the JML, and just set them aside. Now, I think that they add color that requires us to look carefully at this issue. The issue before you is, OK, if it's gone to the jury on plain and ordinary meaning, it did. What is a plain and ordinary meaning? And is there substantial evidence to support a finding of particular under the plain ordinary meaning? And we suggest the answer is no.  At the bottom of Worf's brief at pages 17 and 18, this is where the issue really crystallizes. And what Worf says is, at the very bottom, even Apple's Dr. August confirms such scenarios exist. And he agreed. Then you'll see, quote, a prediction will be associated with more than one load instruction. Only when, quote, aliasing occurs, close quote. And then you'll see the citations. This is the linchpin of their argument responding to the question of Judge Prost and Judge O'Malley on aliasing. This is key. When you go to those pages 2239 to 2240, what you find is the portion that Judge O'Malley quoted is me. But on the very next page, 2240, Dr. August says, no, they're hashed all the time. They're associated with load instructions all the time. And that is consistent with what Dr. Conte said. At A1621, Dr. Conte said, Apple hashes 100% of the time. At A2516 to A2517, Dr. Conte said, hashing and aliasing are different. Hashing and aliasing are different as an undisputed fact of the matter. Apple hashes 100% of the time as an undisputed matter. As a consequence, every load tag is associated with a group of loads. At A1605 to 1606, Dr. Conte conceded that there are only 4,000 or so load tags for the Apple system with millions of load instructions. It has to be a group. I think we're going to bring it to an end. Thank you, Your Honor. Thank you.